**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

MARGARET M. MYERS,

                        Plaintiff,

          - v -                            Civ. No. 7:06-CV-331
                                           (NAM/RFT)

MICHAEL J. ASTRUE, Commissioner of Social
Security,[1]

                        Defendant.

**APPEARANCES:**                            **OF COUNSEL:**

OLINSKY SHURTLIFFF LAW FIRM         JAYA SHURTLIFF, ESQ.
*Attorney for Plaintiff*
300 S. State Street, 5th Floor
Syracuse, New York 13202

SOCIAL SECURITY ADMINISTRATION      ELLEN E. SOVERN, ESQ.
*Attorney for Defendant*
Office of Regional General Counsel, Region II
26 Federal Plaza – Room 3904
New York, New York 10278

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

### REPORT-RECOMMENDATION and ORDER

    Plaintiff Margaret M. Myers moves, pursuant to 42 U.S.C. § 405(g), for review of a decision

by the Commissioner of Social Security denying her application for Period of Disability (POD) and

Disability Insurance Benefits (DIB).[2]  Based upon the following discussion, the Court recommends

that the Commissioner's decision denying benefits be **vacated and remanded**.

---

    [1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007.  Pursuant to Federal
Rule of Civil Procedure 25(d)(1), Michael J. Astrue is substituted as the Defendant in this suit.

    [2] This action has proceeded in accordance with General Order 18, which sets forth the procedures to be followed
when appealing a denial of Social Security Benefits.  Both parties have filed Briefs, though the Court did not hear oral
argument.  Dkt. Nos. 7, Pl.'s Br. & 8, Def.'s Br.

# I. BACKGROUND

Myers, born in 1946, was fifty-seven years old when, on February 27, 2004, she filed her application for POD and DIB. Dkt. No. 3, Admin. Tr. (hereinafter "Tr.") at pp. 44-46. Myers failed the first, fifth, and sixth grades. *Id*. at pp. 68 & 236. She then successfully completed the sixth grade when she was approximately sixteen years-old, but discontinued her formal education after having failed the seventh grade. *Id*. Myers previously performed work as a housekeeper and dishwasher at the military base in Fort Drum, New York, and as a porter at a nursing home in Carthage, New York. *Id*. at pp. 63, 72, 88, & 230-31. Myers stopped working on May 1, 1995, due to emotional problems and too much stress. *Id*. at pp. 62 & 71-72.[3] She notes her onset disability date as June 30, 1996, representing the day she became unable to work due to her mental impairments. *Id*.

## A. Medical History

The Administrative Record contains treatment reports and/or opinions from various treating and consultatively examining healthcare professionals, including: (1) William Kimball, Ph.D., Examining Psychologist; (2) Muhammad Akhtar, M.D., Examining Child and Adolescent Psychiatrist; (3) Jocelyn Azhar-Beane, M.D., Treating Physician; (4) Jeffrey S. Aronowitz, M.D., Treating Psychiatrist; (5) Pamela Spearman, Ph.D.; Agency Psychiatric Reviewer; (6) Kalyani Ganesh, M.D., Agency Consultive Physical Examiner; and (7) Jeanne A. Shapiro, Ph.D., Agency

---

[3] In her application for benefits, Myers explained that "something" happened at work which caused her "illness," but she did not want to state in writing the details of such event. Tr. at p. 95. In 1997, nearly two years after Myers stopped working, she revealed to Jocelyn Azhar-Beane, M.D., her treating physician, that she had stopped working because "people at work were giving her problems [and] saying evil things about her" and "she could tell that they were saying . . . things by the way that they looked at her." *Id*. at p. 130. Similarly, Myers told William Kimball, Ph.D., a psychologist, that she believed that "others on the job were calling her names and accusing her of being homosexual." *Id*. at p. 107. Myers testified before the Administrative Law Judge (ALJ) that when she quit her job, she was depressed about "life in general." *Id*. at p. 230.

Consultive Psychiatric Examiner. *Id*. at pp. 107-215. These records reveal the following regarding the relevant time period of June 30, 1995, Myers's alleged onset disability date, through December 31, 2000, the date Myers was last insured for disability benefits.

On February 19, 1996, Myers sought treatment from Jocelyn Azhar-Beane, M.D., and F. Tontarski, RPA,[4] complaining of headaches, nasal congestion, chills, night sweats, hot flashes, and mood swings. Tr. at p. 133. They observed that Myers was "a little distanced" and that she was "slow in response with her mentation," but she appeared to be normal and her speech was fluent and appropriate. *Id*. Myers was diagnosed as having menopausal syndrome with depression. *Id*. Myers's relayed that her symptoms had progressively worsened over the prior eight months, precipitated by an event eight months prior when she stopped breathing and was taken to the emergency room where, after an evaluation, she was admitted to the hospital for three days. *Id*. The psychiatry department at the hospital recommended institutionalizing Myers, but she refused. Myers's discharge diagnosis was conversion hysteria, menopausal depression, and possible hyperventilation syndrome. *Id*. A computerized axial tomography (CAT) scan and chest x-ray completed at that time were normal, while her electrocardiogram (ECG) revealed a "sinus rhythm with nonspecific ST-T wave abnormalities." *Id*.

Dr. Beane's treatment notes from one year later indicate that Myers was very depressed and uncommunicative with her family members. *Id*. at p. 130. Myers revealed to Dr. Beane that she did "not like going out to meet people." *Id*. Myers explained how she stopped working in June 1995 because people were giving her problems at work and saying "evil things" about her. *Id*.; *see also supra* note 3. Dr. Beane noted "psychosis" as a diagnosis, rule out schizophrenia, and noted the

---

[4] Myers asserts her treatment relationship with Dr. Beane, her general practitioner, began in 1990. Tr. at pp. 69 & 74.

need for a psychiatric assessment; subsequently, Dr. Beane referred Myers to William Kimball, Ph.D., for a mental health evaluation. Tr. at p. 130.

In his initial assessment of Myers, conducted on March 10, 1997, Dr. Kimball noted that she presented symptoms of withdrawal and depression and an obsession with people whom she suspected were talking about her and commenting on her sexuality. *Id*. at pp. 109-11. Dr. Kimball further noted that she had withdrawn from her family, including her sisters and her children and that the only person with whom she related was her husband, who typically accompanied her on the rare occasion that she left the house. *Id.* at pp. 107 & 109. He also noted that she did not leave home for fear that somebody would pick on her. *Id.* at p. 109. He observed that Myers exhibited a defensive attitude and flat affect; the only time she cried was when she talked about going out in public. *Id*. at p. 110. Dr. Kimball reported that Myers was orientated in terms of knowing the date and the President of the United States, but she was unable to perform serial number tests. *Id*. at p. 111. He found that Myers had little insight into her problems. *Id*. Dr. Kimball opined that Myers's clinical picture was unclear and offered a tentative diagnosis of major depression with psychotic features and borderline intellectual functioning. He scheduled psychological testing for Myers. *Id*.

On March 28, 1997, Dr. Kimball administered the Kaufman Brief Intelligence Test (KBIT), Beck Depression Inventory (BDI), and Millon Clinical Multiaxial Inventory-II (MCMI-II). *Id.* at pp. 107-08. He reported that although Myers's mother had passed away two days prior to his evaluation, Myers exhibited a brighter affect compared to her previous visit. *Id.* at p. 107. He also reported that Myers's profile revealed schizoid characteristics and he described her as a private person who preferred to be left alone. *Id*. at p. 108. He further reported that the MCMI-II revealed no evidence of severe anxiety, depression, or thought disorders, but she had a distinct tendency to

*-4-*

avoid self disclosure.  *Id*.  Dr. Kimball opined that a diagnosis remained unclear and he scheduled a psychiatric evaluation with Muhammad Akhtar, M.D., to provide further information for the diagnosis.

On April 4, 1997, Dr. Akhtar performed a psychiatric evaluation of Myers.  *Id*. at pp. 113-14. Dr. Akhtar reported that Myers was alert, attentive, and oriented, but was quiet and sad.  *Id*. at p. 113.  He observed that while Myers's responses to questions were contextually appropriate, they were also monosyllabic.  *Id*.  Dr. Akhtar reported that Myers still exhibited paranoia regarding people.  *Id*.  Dr. Akhtar diagnosed Myers with major depressive disorder, single episode, with psychotic features and prescribed Paxil and Risperdal.  *Id.* at p. 114.

In June 1998, Myers reported to Dr. Beane that she felt good and had no complaints.  *Id*. at pp. 123-24.  In December 1998, Dr. Beane noted that Myers's mood was good and her medication was helping; she further stated that Myers's depression was stable.  *Id*. at p. 121.  Then, in September 1999, Myers told Dr. Beane that she had been off her medication for six months and her depression was better.  *Id*. at p. 119.  Dr. Beane further observed that on that date, Myers maintained good eye contact, was cheerful, and had appropriate responses.  *Id*.

In 2001, after the expiration of her disability insured status, Myers began reporting problems again.  On June 26, 2001, Dr. Beane noted that Myers had auditory hallucinations and mistakenly believed that she and her husband had won the lottery.  *Id*. at p. 116.  She also noted that Myers wanted to be with her husband at all times for fear that he would otherwise leave.  Myers's husband, however, refused to hospitalize her so Myers opted to retain the services of a caretaker while her husband was at work.  *Id*.  Dr. Beane resumed Myers's medication regiment and referred Myers to Jeffrey Aronowitz, M.D., for a psychiatric evaluation.  *Id.* at pp. 116 & 168.

On July 14, 2001, Dr. Aronowitz evaluated Myers. *Id*. at pp. 168-69. In his report, Dr. Aronowitz catalogued Myers's psychotic symptoms, including auditory hallucinations, delusions, insecurity, and irritability, which appeared to occur within the context of depression marked by depressed moods, tearful episodes, and fitful sleep. *Id.* at p. 168. He noted that Myers constantly wanted her husband by her side. *Id*. Dr. Aronowitz observed that Myers appeared internally preoccupied and exhibited a depressed mood with blunted, low intensity mood, and congruent affect. *Id*. at p. 169. Dr. Aronowitz also noted that Myers was alert, fully conscious, and exhibited a pleasant and cooperative attitude. *Id*. Myers described her auditory hallucinations, grandiose delusions, and referential thinking to Dr. Aronowitz, which were consistent with her previous psychotic symptoms. *Id*. Dr. Aronowitz diagnosed Myers with major depressive disorder, recurrent, with severe psychotic features, and he assessed her global assessment of functioning (GAF) score at 50, Tr. at p. 169, which indicates "any serious impairment in social, occupational, or school functioning." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed) at p. 34. Dr. Aronowitz prescribed Zyprexa and Paxil, with an emphasis on full medication compliance, and a course of individual psychotherapy. Tr. at p. 169.

Between July 26, 2001 and November 11, 2003, Myers followed up with Dr. Aronowitz a total of thirteen times. *Id.* at pp. 170-74. Dr. Aronowitz's treatment notes indicate that with full medication compliance, her condition stabilized and she consistently exhibited an euthymic mood without internal preoccupations. During this period, Myers reported that she enjoyed playing bingo, attended local car races, spent time with her daughter, visited her sister, and assisted with a home remodeling project. *Id.* Dr. Aronowitz's last entry noted that Myers had "been feeling pretty good" and that she traveled with relatives to New York City over the summer. *Id*. at p. 174.

In conjunction with her disability benefits application, Kalyani Ganesh, M.D., conducted an internal medicine consultative examination of Myers on October 26, 2004. *Id*. at pp. 193-95. Dr. Ganesh reported that Myers complained of depression, stress, a desire to be alone, and nervousness. *Id*. at p. 193. Dr. Ganesh opined that Myers did not suffer from any physical limitations regarding her ability to sit, stand, walk, or in the use of her upper extremities. *Id*. at p. 195. Dr. Ganesh found that Myers could frequently climb, balance, kneel, crouch, crawl, and stoop and that she did not suffer from any manipulative, visual/communicative, or environmental limitations. *Id.* at pp. 196-99.

Also in conjunction with her disability benefits application, Jeanne A. Shapiro, Ph.D., conducted a consultative psychiatric examination of Myers and administered a consultative intelligence test to her on October 26, 2004. *Id*. at pp. 202-09. Dr. Shapiro reported that when she asked Myers to identify what prevented her from working, Myers's response was a moving target: "First she stated that it was depression, then when she realized that she had written on her form that her psychiatric symptoms were well-controlled, she stated stress. Then when asked about the stress, she stated that she has difficulty breathing. When asked about the difficulty breathing, she stated that it was actually because of right hip pain." *Id.* at p. 202. Myers indicated to Dr. Shapiro that her medication effectively controlled her psychiatric symptoms. *Id*. at p. 203. Dr. Shapiro found Myers to be cooperative, but suspected that she was malingering. *Id*. at pp. 203-04. Dr. Shapiro noted that Myers presented a calm mood and an affect congruent with her thoughts and speech. *Id*. at p. 204. She further noted that Myers's attention and concentration were intact and she was able to count, perform simple calculations, and serial threes. *Id*. Myers indicated that she was able to dress, bathe, and groom herself, prepare and cook food, clean, wash her clothes, shop, manage money, drive, and

take public transportation. *Id*. She further indicated that she maintained positive interaction with her family and friends. *Id*. Dr. Shapiro opined that Myers appeared to be capable of understanding and following simple instructions, performing simple tasks, and maintaining attention and concentration in the performance of tasks. *Id*. at p. 205. She found that Myers appeared to relate to and interact appropriately with others and was capable of dealing with stress. *Id*. Dr. Shapiro noted that the results of the examination were inconsistent with Myers's alleged symptoms, which she noted were under control. *Id*. Dr. Shapiro concluded that Myers was mildly mentally retarded and recommended that she pursue vocational training and subsequent job coaching; she further recommended Myers continue her current psychiatric treatment. *Id*.

Dr. Shapiro also completed a medical assessment regarding Myers's ability to perform work-related activities. *Id*. at pp. 207-09. With respect to occupational adjustments, Dr. Shapiro noted no limitations on Myers's ability to follow work rules, relate to co-workers, deal with the public, interact with supervisors, and maintain concentration. *Id*. at p. 207. She noted that Myers's ability to deal with stress was good and her use of judgment was fair, while her ability to function independently fluctuated between unlimited and fair based upon the particular occupational requirements. *Id*. With respect to performance adjustments, Dr. Shapiro found that Myers's ability to understand, remember, and perform complex job instructions was poor; her ability to perform detailed but not complex job instructions was fair; and her ability to perform simple job instructions was unlimited. *Id*. at p. 208. With respect to personal social adjustments, Dr. Shapiro did not find any restrictions regarding Myers's personal appearance, her ability to behave in an emotionally stable manner, her ability to relate predictably in social situations, or in her dependability. *Id*.

Dr. Shapiro also administered the Weschler Adult Intelligence Scale-III (WAIS-III), a

standardized intelligence test, to Myers on October 26, 2004.  *Id*. at pp. 211-15.  Based upon the

WAIS-III test results, Dr. Shapiro determined that Myers's verbal intelligence quotient (IQ) was 74,

her performance IQ was 70, and her full scale IQ was 70, which denotes functioning in the "high

mild range of mental retardation."  *Id*. at p. 213.  Dr. Shapiro considered the results valid and a

reliable estimate of Myers's functioning.  *Id*.  Dr. Shapiro found that Myers appeared to be incapable

of reading, writing, or performing arithmetic at an age appropriate level, but she could perform rote

tasks in an appropriate setting.  *Id*. at p. 214.  Dr. Shapiro found that the results of the test were

inconsistent with Myers's allegations pertaining to her psychiatric symptoms.  *Id*.  Dr. Shapiro

recommended that Myers pursue vocational training and subsequent job coaching as well as

continued psychiatric treatment.  Dr. Shapiro concluded that Myers's prognosis was good, but that

she might need assistance in managing money due to her mental retardation. *Id*. at p. 215.

## B.  Procedural History

On February 27, 2004, Myers filed an application for POD and DIB alleging a disability

onset date of June 30, 1995, due to emotional problems and stress.[5]  *Id*. at pp. 44-46, 62, & 71-72.

Her application was initially denied on April 21, 2004.  *Id*. at pp. 30-34.  On December, 21, 2004,

Myers appeared on her own behalf for a Hearing, via teleconference, before Administrative Law

Judge (ALJ) John Murdock.  *Id.* at pp. 225-41.  Upon questioning by the ALJ, Myers waived her

right to representation and opted to continue with the Hearing unrepresented.  *Id*. at pp. 227-29.

Both Myers and her husband, Lester Myers, testified at the Hearing.  On March 19, 2005, ALJ

Murdock issued a decision finding Myers was not under a disability.  *Id*. at pp. 17-23.  Finding no

---

[5] Myers had filed an application for POD and DIB in November 1997, alleging an onset disability date of June 30, 1995.  Myers's 1997 application was initially denied on March 10, 1998, and then on reconsideration on April 6, 1998.  Myers did not file an appeal of the denial nor did she seek reopening of that application.  Tr. at pp. 20 & 77.

basis under the Regulations to review ALJ Murdock's Decision, the Appeals Council denied the Request for Review on February 17, 2006, thus rendering the ALJ's decision the final determination of the Commissioner. *Id.* at pp. 4-7. Having exhausted all of her options for review through the Social Security Administration's tribunals, Plaintiff now brings this appeal. Dkt. No. 1, Compl.

## II. DISCUSSION

### A. Standard of Review

Under 42 U.S.C. § 405(g), the proper standard of review for this Court is not to employ a *de novo* review, but rather to discern whether substantial evidence supports the Commissioner's findings and that the correct legal standards have been applied. *See Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *Urtz v. Callahan*, 965 F. Supp. 324, 325-26 (N.D.N.Y. 1997) (citing, *inter alia*, *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). Succinctly defined, substantial evidence is "more than a mere scintilla," it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

The ALJ must set forth the crucial factors supporting the decision with sufficient specificity. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). Where the ALJ's findings are supported by substantial evidence, the court may not interject its interpretation of the administrative record. *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); 42 U.S.C. § 405(g). Where the weight of the evidence, however, does not meet the requirement for substantial evidence or a reasonable basis for doubt exists as to whether the ALJ applied the correct legal principles, the court may not affirm the ALJ's decision. *Johnson v. Bowen*, 817 F .2d at 986.

### B. Determination of Disability

*-10-*

To be considered disabled within the meaning of the Social Security Act, a plaintiff must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore, the claimant's physical or mental impairments must be of such severity as to prevent engagement in any kind of substantial gainful work which exists in the national economy. *Id.* at § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner follows a five-step analysis set forth in the Administration's Regulations. 20 C.F.R. § 404.1520.

> The first step of this process requires the Secretary to determine whether the claimant is presently employed. If the claimant is not employed, the Secretary then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the Secretary next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the Secretary will find the claimant disabled. However, if the claimant does not have a listed impairment, the Secretary must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the Secretary determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the Secretary to prove in the fifth step that the claimant is capable of working. *See Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

*Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

In addition to the above, the Commissioner has promulgated Regulations governing evaluations of the severity of a mental impairment. 20 C.F.R. 404.1520a.

> These regulations require application of a "special technique" at the second and third steps of the five-step framework, *Schmidt v. Astrue*, 496 F.3d 833, 844 n.4 (7th Cir. 2007), and at each level of administrative review. 20 C.F.R. § 404.1520a(a). This technique requires the reviewing authority to determine first whether the claimant has a "medically determinable mental impairment." [*Id*. at] § 404.1520a(b)(1). If the

claimant is found to have such an impairment, the reviewing authority must "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c)," § 404.1520a(b)(2), which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. [*Id*. at] § 404.1520a(c)(3). According to the regulations, if the degree of limitation in each of the first three areas is rated "mild" or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not "severe" and will deny benefits. [*Id*. at] § 404.1520a(d)(1). If the claimant's mental impairment is severe, the reviewing authority will first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder. [*Id*. at] § 404.1520a(d)(2). If so, the claimant will be found to be disabled. If not, the reviewing authority will then assess the claimant's residual functional capacity. [*Id*. at] § 404.1520a(d)(3).

*Kohler v. Astrue*, 546 F.3d 260, 265-66 (2d Cir. 2008).

## C.  ALJ Murdock's Findings

In his written decision, ALJ Murdock indicated that Myers met the nondisability requirements for POD and DIB, as set forth in Section 216(i) of the Social Security Act, and was insured for benefits through December 21, 2000. Tr. at p. 20. The issue before ALJ Murdock was whether Myers was under a disability, as defined by the statute, from June 30, 1995, her alleged onset date, through December 31, 2000, her date last insured. *Id*. Using the five-step sequential evaluation, ALJ Murdock determined that 1) Myers had not engaged in substantial gainful activity since the alleged onset of her disability; and  2) while Myers's depressive disorder was a medically determinable impairment, she did not have an impairment or combination of impairments that significantly limited her ability to perform basic work-related activities. *Id*. at pp. 21-23. Accordingly, he found that Myers did not have a "severe" impairment and, thus, she was not under a disability at any time through the date of his decision. *Id*. at p. 23.

## D.  Myers's Contentions

Myers advances five principle arguments in support of her claim for relief. First, Myers

contends that she did not make a knowing and voluntary waiver of her right to representation and suffered undue prejudice as a result.  Second, Myers claims that ALJ Murdock failed to fully develop the record and correctly apply the treating physician rule.  Third, Myers asserts that ALJ Murdock erred in his assessment of the severity of her mild mental retardation and depression.  Fourth, Myers argues that ALJ Murdock erred in his analysis of her and her husband's credibility and failed to conform his analysis to Social Security Ruling 96-7p and 20 C.F.R. § 404.1529.  Finally, Myers contests the ALJ's determination that her impairments did not meet or equal Listing 12.05(C).  *See generally* Pl.'s Br.

### *1.  Right to Representation*

Myers alleges that ALJ Murdock did not properly advise her of her right to representation, particularly in light of her diagnosis of mild mental retardation.  Myers alleges that she did not make a knowing and voluntary waiver of her right to representation and that she suffered prejudice to her claim as a result.  Specifically, Myers claims that ALJ Murdock failed to fully apprise her of the benefits of having a representative as well as the fee arrangements available, and he failed to ensure that she received and understood the written notifications regarding her right to representation.  She argues that in light of these alleged failures, it is unclear whether she was aware of the benefits of counsel, the possibility of free representation or a contingency fee arrangement, or the statutory twenty-five (25) percent withholding limitation.  Pl.'s Br. at pp. 10 & 12.  Lastly, Myers claims she suffered prejudice in light of the ALJ's failure to fully develop the record and follow the Treating Physician Rule.  The Commissioner argues that Myers knowingly and voluntarily waived her right to representation and that the ALJ fully developed the record.  Def.'s Br. at p. 7.

The Social Security Act provides that the "Commissioner . . . shall notify each claimant in

writing, together with the notice to such claimant of an adverse determination, of the options for

obtaining attorneys to represent individuals in presenting their cases . . . . Such notification shall also

advise the claimant of the availability to qualifying claimants of legal services organizations which

provide legal services free of charge."  42 U.S.C. §§ 406(c) & 1383(d)(2)(b); *see also* 20 C.F.R. §

404.1706 (requiring the dissemination of information explaining the existence of free legal services).

The Second Circuit has held that in addition to this initial notification, an ALJ must ensure that the

claimant is aware of her right to representation, *Robinson v. Sec'y of Health and Human Servs.*, 733

F.2d 255, 257 (2d Cir. 1984), and that a claimant's waiver of counsel is knowing and voluntary,

*Rose v. Barnhart*, 2003 WL 1212866, at *3 (S.D.N.Y. Mar. 14, 2003).  The Regulations similarly

permit a claimant to appoint an attorney, 20 C.F.R. § 404.1705, and mandate that the ALJ inform

a claimant of her right to representation at the start of the hearing, 20 C.F.R. § 404.938(b).

On April 21, 2004, prior to the ALJ Hearing, the Administration complied with the above

provisions by sending Myers literature pertaining to her right to counsel, the existence of legal

service organizations, and a summary of the hearing process.  Tr. at pp. 31-33.  Such notifications

set forth in the Administrative Transcript are as follows:

- On April 21, 2004, the Social Security Administration mailed Plaintiff a "Notice of
  Disapproved Claim" informing her that her claim for Social Security Benefits had been
  denied at the initial stage.  Tr. at p. 31.  In addition to explaining the reasons for denying her
  claim, the Notice explains the various options at Myers's disposal, including requesting a
  hearing before an ALJ.  *Id*. at pp. 32-33.  The Notice further explained to Myers the
  procedures entailed in such hearings as well as her right to have help with her appeal.  *Id*.
  In this regard, the Notice states,

  > [y]ou can have a friend, lawyer, or someone else help you.  There are
  > groups that can help you find a lawyer or give you free legal services
  > if you qualify.  There are also lawyers who do not charge unless you
  > win your appeal.  Your local Social Security office has a list of

> groups that can help you with your appeal.  If you get someone to help you, you should let us know.  If you hire someone, we must approve the fee before he or she can collect it.  And if you hire a lawyer, we will withhold up to 25 percent of any past due Social Security benefits to pay toward the fee.

*Id*. at p. 33.

• On May 19, 2004, Myers completed a Form whereby she requested a hearing before an ALJ. *Id* at p. 35. Within that signed statement, located right above Ms. Myers's signature, is the following: "I UNDERSTAND I HAVE A RIGHT TO BE REPRESENTED AT THE HEARING."  *Id*. (emphasis in original).

• On July 22, 2004, the Administration sent Myers a letter acknowledging receipt of the request for an ALJ hearing and explaining the hearing process and information aimed to help Myers prepare for the hearing. *Id*. at p. 36. Within that letter, the Administration explained:

> You may choose to be represented by a lawyer or other person.  A representative can help you get evidence, prepare for the hearing, and present your case at the hearing.  If you decide to have a representative, you should find one immediately so that he or she can start preparing your case.  Some private lawyers charge a fee only if you receive benefits.  Some organizations may be able to represent you free of charge.  Your representative may not charge or receive any fee unless we approve it.

*Id*.

Enclosed with that Notice was a leaflet entitled "Social Security and Your Right to Representation," which, *inter alia*, provided an explanation of the fee agreement and approval process, including the twenty-five (25) percent withholding limitation for attorney's fees. *Id.* at pp. 37-39.  The Administration also included a list of groups that could help Myers find a representative.  *Id.* at p. 42.

• On December 3, 2004, a "Notice of Hearing," was mailed to Myers from ALJ Murdock advising as follows: "[i]f you want to have a representative, please get one right away." *Id.* at p. 27.

• During the Hearing, ALJ Murdock, Myers, and her husband engaged in the following colloquy on this matter:

> ALJ:          Mr. Myers, I assume you aren't trained in presenting Social Security cases?

**-15-**

| | |
|---|---|
| Mr. Myers: | No, I'm not. |
| ALJ: | All right.  Were the two of you aware that you could have a lawyer or other trained person help you present the case today? |
| Myers: | Yes, I do [sic].  I got a lawyer, but he said that I didn't have a case because I wasn't disabled or poor.  Do you have the letter from him? |
| ALJ: | No.  You didn't think that he'd be much help there in the case today, in other words. |
| Myers: | That's true.  I thought another lawyer would say the same thing. |
| ALJ: | All right.  Well, let's go ahead and proceed.  If you start feeling that you want to take some time to see if you could find another lawyer who might take a different view, just tell me.  Or if I think that you'd be better off getting somebody to help you then I'll stop the hearing but I think we'll be able to go ahead today and see how far we can get. |

Tr. at pp. 228-29.

In his written decision, ALJ Murdock noted that although he fully apprised Myers of her right to representation, she elected to proceed without representation. *Id*. at p. 20.  Incredulously, in spite of all the above, Myers asserts that there is no evidence that she received the Notice of Right to Representation (reproduced at pages 38-42 in the Administrative Transcript) and that she was not fully informed of her right to representation, therefore, her waiver was not voluntary nor knowing. Pl.'s Br. at pp. 10-13.  In support of her contention, Myers cites *Frank v. Chater*, 924 F. Supp. 416, 423-24 (E.D.N.Y. 1996) for the proposition that she should have been provided with written notice of the right to representation which contains: "(a) an explanation of the benefits of counsel; (b) the possibility of free counsel or a contingency fee arrangement; and (c) notification of the statutory 25% withholding limitation on attorneys' fees."  *Id*. at p. 10.  Plaintiff further contends that it was the ALJ's obligation to "verify" that she received such notice.  *Id*. (citing *Frank v. Chater*, 924 F. Supp. at 423-24).  Myers contends that because the ALJ did not inquire whether she received the

*-16-*

relevant papers from the Administration and because through his questioning he led her to believe he would stop the Hearing at some point to allow her to obtain representation, the ALJ applied the incorrect legal standard to fully apprise her of her right to counsel. *Id*. at p. 13.

We find Plaintiff's argument to be without merit, especially in light of a recent Second Circuit opinion which specifically denounced the heightened notice standards enunciated in *Frank v. Chater*. *See Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 2009 WL 982448 (2d Cir. Apr. 14, 2009) (abrogating *Frank v. Chater* and ruling as a matter of first impression that an ALJ is not required to make disclosures to *pro se* claimants regarding the right to counsel beyond those mandated by statute);[6] *see also Gonzales v. Barnhart*, 2003 WL 22383376, at *5 (S.D.N.Y. Oct. 16, 2003) (explaining that the Commissioner and the ALJ are "only bound to follow the notice requirements set out in the Acts").

In light of *Lamay*, we find that the Administration's written notifications in this case more than adequately advised Myers of her right to representation. Myers's argument that ALJ Murdock did not ask her whether she received the hearing acknowledgment letter imputes to him a responsibility not mandated by the Social Security Act's notice requirements. Moreover, there is no question that Myers signed her hearing request, thereby acknowledging that she understood she had a right to representation. Finally, ALJ Murdock extended to Myers the opportunity to adjourn the Hearing if she decided that she wanted additional time to secure the services of an attorney.[7]

---

[6] Incidentally, we note that Plaintiff's counsel in this appeal also represented Crystal Lamay and proffered the very same rationale in support of her arguments regarding proper notification of right to counsel. *See Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 2009 WL 982448 (2d Cir. Apr. 14, 2009) (Jaya A. Shurtliff, Of Counsel, Olinsky & Shurtliff, LLP, appearing on behalf of plaintiff-appellant); *see also Lamay v. Comm'r of Soc. Sec.*, Civ. No. 5:05-CV-845 (GLS/DEP) (N.D.N.Y.).

[7] Courts have found effective waivers when the ALJ offered to adjourn the hearing in order for the claimant to obtain representation. *See Gonzalez v. Barnhart*, 2003 WL 22383376, at *4 (S.D.N.Y. Oct. 16, 2003) ("On the advice
(continued...)

Myers was not confronted by the Hobson's choice of either continuing the Hearing without representation or facing dismissal of the action, *see Spears v. Heckler*, 625 F. Supp. 208, 218 (S.D.N.Y. 1985), nor is there anything to suggest that she was actively seeking representation at the time of the Hearing,[8] *see Frank v. Chater*, 924 F. Supp. 416, 427 (E.D.N.Y. 1996) (finding an ineffective waiver where the ALJ failed to adjourn a hearing when claimant stated that "he had an appointment that very day with a legal services organization").  In fact, Myers's admission at the Hearing that she unsuccessfully attempted to retain counsel tends to discredit the argument that she was unaware of the benefits of counsel.  Tr. at p. 228; *cf. Gonzales v. Barnhart*, 2003 WL 22383376, at *4 (explaining that claimant's admission that he attempted to contact an organization to retain counsel further negated that possibility that his failure to retain counsel was due to a deficiency of notice or an ignorance as to the available services).  In light of the foregoing, the Court finds that Myers knowingly and voluntarily waived her right to representation.  Because we find that Myers knowingly and voluntarily waived her right to representation, we need not assess whether she suffered any prejudice resulting from her lack of representation.[9]

---

[7](...continued)
of the ALJ, Gonzalez decided to adjourn in an effort to retain the assistance of an attorney."); *Salomon v. Apfel*, 2000 WL 776924, at *6 (S.D.N.Y. June 15, 2000) (finding effective waiver where the ALJ told claimant: "If you wish, you could go home today, get a lawyer and come back and do this hearing another time.").

[8] During the colloquy regarding representation, Myers stated that the lawyer she consulted informed her she did not have a case because she wasn't "disabled or poor" and she figured another lawyer would say the same.  Tr. at p. 228.

[9] While we decline to address the prejudice prong of Myers's representation claim, we construe her arguments in support of this claim to raise individual attacks against the viability of the ALJ's denial of her claim for benefits and consider each argument in turn.

## 2. *Development of the Record*

In her disability application, Myers notified the Administration of three treating sources: Dr. Beane, her general practitioner, Dr. Aronowitz, her treating psychiatrist, and Mercy of Northern New York ("Mercy").  Tr. at pp. 64, 69, 74, 97-98, & 104.  Myers alleges that ALJ Murdock failed to request updated treatment notes and opinions from Drs. Aronowitz and Beane regarding functional limitations imposed by her impairments and thereby failed to adequately develop the record.  Pl.'s Br. at pp. 13-14 & 16.

In light of the remedial intent of the Social Security statute, and the non-adversarial nature of benefits proceedings, an ALJ has an affirmative duty to develop the medical record if it is incomplete.  *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); 20 C.F.R. § 404.1512(d) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application . . . .").  This affirmative duty is heightened in cases involving *pro se* claimants as the "ALJ has a duty to adequately protect a *pro* se claimant's rights 'by ensuring that all of the relevant facts [are] sufficiently developed and considered.'" *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990) (quoting *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980)).  When a claimant is unassisted by counsel, the ALJ has the duty to scrupulously and conscientiously probe into, inquire of, and explore all the relevant facts.  *Gold v. Sec'y of Health, Educ. and Welfare*, 463 F.2d 38, 43 (2d Cir. 1972).  In this regard, the ALJ must make "every reasonable effort to help [the claimant] get medical reports from [his or her] own medical sources."  *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (quoting 20 C.F.R. § 404.1512(d)); *see also Sanchez v. Barnhart*, 329 F. Supp. 2d 445, 450-51 (S.D.N.Y. 2004).  "Accordingly, an ALJ may not rely, as factfinders in adversarial proceedings customarily do, on the

*absence* of probative evidence supporting the opinions of a claimant's expert, without making an affirmative effort to fill any gaps in the record before him." *Sanchez v. Barnhart*, 329 F. Supp. 2d at 450 (emphasis in original) (internal quotation marks and citations omitted). In furtherance of the duty to develop the record, an ALJ may re-contact medical sources if the evidence received from the treating physician or other medical sources is inadequate to determine disability and additional information is needed to reach a determination. 20 C.F.R. at § 404.1512(e). The Regulations, however, further specify that "the lack of [a] medical source statement will not make the [medical] report incomplete." 20 C.F.R. § 404.1513(b)(6).

The Commissioner argues that the Social Security Agency and the ALJ fully developed the record. The Commissioner submits that the Agency obtained or attempted to obtain treatment records from each listed source and argues that any error resulting from the absence of updated treatment records was harmless because: (1) updated treatment notes would extend beyond the relevant period of time, June 1995 through December 2000; (2) such treatment records would only show bi-yearly maintenance visits; (3) Myers conceded that once she began treating with Dr. Aronowitz, her symptoms were under control; (4) the Administration obtained consultative physical and psychiatric examinations and an intelligence evaluation of Myers after the expiration of her insured status; and (5) Myers's attorney, retained shortly after ALJ Murdock issued his decision, did not submit any additional evidence to the Appeals Council. Def.'s Br. at pp. 8-9.

First, we note that with regard to Mercy, upon the Administration's request for treatment records, Mercy reviewed its data but found no indication that it had treated Myers in any of its facilities' clinics. Tr. at p. 177. Thus, there was no further obligation for the Administration to pursue records from Mercy.

Second, we see no error with regard to the dates of treatment records obtained by the Agency considering the relevant time period is June 30, 1995 through December 31, 2000.  The Agency obtained Myers's records from her treatment with Dr. Beane through six months beyond the date for which she was last insured.  *See id.* at pp. 116-65.  The Agency also obtained Myers's records from her treatment with Dr. Aronowitz dating from July of 2001 through November of 2003, constituting roughly three years beyond the expiration of her insured status.  *Id.* at pp. 168-74.  In addition, the Agency obtained Myers's records from Genesis Healthcare through which Dr. Kimball and Dr. Akhtar provided treatment a total of three times between March 10, 1997, and April 4, 1997. *Id*. at pp. 107-15.

However, while we find that the relevant time period for the obtained treatment records was proper, the Agency's efforts nevertheless fall short with respect to obtaining opinions from Myers's treating sources as to the functional limitations imposed as a result of Myers's impairments.

The Regulations require an ALJ to give controlling weight to a treating physician's opinion on the nature and severity of a claimant's impairments when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." 20 C.F.R. § 404.1527(d)(2).  To adequately develop the record, "the ALJ must obtain the treating physician's opinion regarding the claimant's alleged disability; 'raw data' or even complete medical records are insufficient by themselves to fulfill the ALJ's duty." *Dimitriadis v. Barnhart*, 2004 WL 540493, at *9 (S.D.N.Y. Mar. 17, 2004) (quoting *Peed v. Sullivan*, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991)).  An ALJ's duty to develop the record and the treating physician rule do not operate independently of each other:

> [T]he duty to develop a full record and to assist a pro se plaintiff compels the ALJ to move beyond pro forma compliance with the treating physician rule and to obtain

*-21-*

from the treating source expert opinions as to the nature and severity of the claimed disability. . . . What is valuable about the perspective of the treating physician – what distinguishes him from the examining physician and from the ALJ – is his opportunity to develop an informed *opinion* as to the [mental] status of a patient. To obtain from a treating physician nothing more than charts and laboratory test results is to undermine the distinctive quality of the treating physician that makes his evidence so much more reliable than that of an examining physician who sees the claimant once and who performs the same tests and studies as the treating physician. It is the *opinion* of the treating physician that is to be sought; it is his *opinion* as to the existence and severity of a disability that is to be given deference. Thus, when the claimant appears pro se, the combined force of the treating physician rule and of the duty to conduct a searching review requires that the ALJ make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of that treating physician as to the existence, the nature, and the severity of the claimed disability.

*Peed v. Sullivan*, 778 F. Supp. at 1246 (emphasis in original) (internal citations omitted).

We concede, as the Commissioner points out, that ALJ Murdock had at his disposal medical source statements from Drs. Ganesh and Shapiro. However, both doctors consultatively examined Myers with respect to her functioning after the expiration of her insured status. There is no indication in the record that ALJ made any effort to contact either of Myers's treating sources – Drs. Beane and Aronowitz – to obtain their opinions regarding the existence, nature, and severity of her claimed mental impairments, especially during the period at issue, nor is there any indication in the record that ALJ Murdock advised Myers the importance of such opinions and how she could obtain them on her own, let alone the tools at his disposal to obtain them on her behalf. *See Smith v. Astrue*, 2008 WL 4517810, at *8 (N.D.N.Y. Sept. 30, 2008) (explaining that when treating source opinions were absent, the ALJ should have attempted to contact the treating sources to obtain their opinions regarding claimant's mental impairments). In light of Myers's level of intellectual functioning and her *pro status* at the time of the Hearing, ALJ Murdock's failure to re-contact her treating physicians and advise her of the importance of the evidence fell short of his obligation under the Regulations to conduct a searching review. *Smith v. Astrue*, 2008 WL 4517810, at *8-9 (noting

the record was bereft of any attempt to obtain the treating physician's opinion by way of letters or subpoenas); *Flanders v. Chater*, 1995 WL 608287, at *7 (S.D.N.Y. Oct. 17, 1995) ("At the very least, before denying a *pro se* claimant's application, the ALJ should advise the claimant that he considers [her] case unpersuasive, and . . . suggest that [she] produce additional medical evidence or call [her treating physician] as a witness.") (alterations in original) (internal quotation marks and citation omitted).  Accordingly, remand is appropriate for further development of the record.  *See Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980); *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997) ("Where there are gaps in the administrative record, remand to the Commissioner for further development of the evidence is in order.") (cited in *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999)); *Steficek v. Barnhart*, 462 F. Supp. 2d 415, 418 (W.D.N.Y. 2006) (explaining that remand is warranted if "further findings or explanation will clarify the rationale for the ALJ's decision.") (citing *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

### 3.  Other Issues

Myers's remaining arguments focus on the ALJ's 1) finding that her mild mental retardation and depression were not severe impairments during the relevant time period, 2) determination that her credibility is poor, and 3) failure to assess whether her impairments met or medically equaled a Listed Impairment.  Because we find that there was an inadequate development of the record, as set forth above, the entirety of the ALJ's disability evaluation, which incidentally ceased at Step Two, was necessarily tainted, thus rendering the remaining contentions unreviewable.

### III. CONCLUSION

In light of ALJ's Murdock's failure to fully develop the record, the proper avenue is to remand this matter for further proceedings.  On remand, the Commissioner should re-contact

Myers's treating physicians, Dr. Beane and Dr. Aronowitz, and ask them to provide opinions regarding Myers's functional limitations with respect to her depression and mental retardation as to the relevant period of June 30, 1995 through December 31, 2000.  Upon further development of the record, the case should be remanded back to an ALJ to properly assess the severity of Myers's impairments and then consider, if applicable, Myers's impairments in relation to the Listings, her residual functional capacity (RFC) and whether her RFC allows her to perform her past work and, if necessary, any other work.

**WHEREFORE,** it is hereby

**RECOMMENDED,** that the Commissioner's decision denying disability benefits be **REVERSED** and this matter be **REMANDED** to the Commissioner, pursuant to Sentence Four of 42 U.S.C. § 405(g), for further proceedings consistent with the above; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

Date:   May 13, 2009
        Albany, New York

RANDOLPH F. TREECE
United States Magistrate Judge